ELIZABETH HARMAN ET AL., CROSS-APPELLANTS, V. BENJAMIN FISHER ET AL., APPELLEES; JOHN KOLP ET AL., APPELLANTS.

FILED JANUARY 24, 1912. No. 16,961.

1. **Trusts: DEED: VALIDITY: ADVERSE POSSESSION.** An express trust with respect to real estate may not be created or declared by parol, yet if a parent conveys a tract of land to her son for the benefit of J., the grantee, and his brother B., and for more than ten years subsequently they occupy the land as tenants in common, B. tilling the farm and making lasting and valuable improvements thereon, under a claim of ownership, and J. conceding during that period that his brother owns one-half of the land, the heirs of J. will not be permitted to disturb B. in his possession and title to an undivided one-half of the real estate, notwithstanding there is no written evidence of a trust or of B.'s title and none was ever executed.

2. **Deeds: CONSIDERATION: PAROL EVIDENCE.** In a contest between heirs of the whole blood and heirs of the half-blood of an intestate, oral evidence is admissible to prove that the sole consideration for the deed from his mother, whereby he was vested with title to the tract of land in controversy, was love and affection, notwithstanding the sole recitation in the deed of a consideration is a substantial, valuable consideration.

APPEAL from the district court for Furnas county: ROBERT C. ORR, JUDGE. *Affirmed.*

*J. J. Thomas, John F. Fults, W. B. Whitney* and *F. W. Byrd,* for appellants.

*Perry, Lambe & Butler* and *John Stevens, Jr.,* for cross-appellants.

*W. S. Morlan, contra.*

ROOT, J.

This is an action in equity to settle conflicting claims to a quarter section of land in Furnas county. The case is here on appeal and cross-appeals.

Elizabeth Fisher, a widow, one of the pioneers of Furnas county, acquired title from the United States to the land in controversy. Mrs. Fisher was the second wife of her husband, and to them were born three sons and two daughters, all of whom attained maturity. Of these children Benjamin, the oldest, for many years was the head of the family. One son, Perley J. Fisher, departed this life subsequently to his mother's demise, and his heirs are parties to this action. The daughters married, and they also are parties hereto. Benjamin, subsequently to his marriage, lived separate from his mother, but in the immediate neighborhood of her home. The other son, John Thomas Fisher, remained unmarried, and departed this life intestate May 28, 1908. Elizabeth Fisher departed this life intestate September 17, 1895. There are numerous other parties to this action, all of whom are relatives of the half-blood of John Thomas Fisher or assignees of some of those relatives. For convenience sake they will be collectively referred to as "the half-bloods." All of these relatives are descendants of John Thomas Fisher's father by the first marriage, and in the veins of none of them flows the blood of Elizabeth Fisher.

There is evidence to prove and this court may take judicial notice of the fact that droughts, insect plagues and almost universal low prices for farm products prevailed in western Nebraska during many of the years covered by this inquiry. The proof also discloses that Benjamin Fisher years ago sold his homestead, and the pro-

ceeds were used in part at least for the benefit of his mother's family; the same sacrifice was made by one of the daughters; and John Thomas also brought to the common fund the proceeds of the sale of a tract of land formerly owned by him. The close and tender relations which the evidence discloses existed between this widow and all of her children continued to the close of her natural life.

In 1895, during a period of financial depression, the Fishers were in sore need of money, and, for the purpose of supplying her sons Benjamin and John Thomas with funds, Elizabeth Fisher, probably at the suggestion of Benjamin, determined to mortgage her farm; she also concluded that, for the purpose of keeping the title to the homestead in those sons, she would convey the farm to them. The attendance of a justice of the peace was procured, and, according to his testimony, he was directed by Mrs. Fisher to prepare a deed conveying the farm to these men. She said, "My time is short, and I want this land to remain with the Fisher boys," referring to Benjamin and John. Before the deed was drawn, it was mentioned that Benjamin's wife was not in condition to go to Beaver City, the county seat, to sign the mortgage, which it was proposed should be made, and thereupon it was suggested by the scrivener, or by Benjamin, that the deed might be made to the unmarried son, John Thomas, and this was done. Subsequently the mortgage was executed to secure the payment of $500. The deed was executed February 28, 1895, but seven months before Mrs. Fisher died. The proof discloses that John Thomas Fisher was an easy-going, pleasure-loving man of simple tastes, working at times on the farm and on another quarter section, the title whereto he acquired under the pre-emption laws, but devoting considerable of his time to hunting, attending baseball games, and occasionally indulging in a mild drinking bout. Benjamin farmed his land, the land in controversy, and John Thomas' pre-emption, so that Benjamin received all of the income from these tracts of land; he also paid the taxes thereon, and supplied John Thomas

with whatever money he desired. With one possible exception there seems to have been no friction between the brothers; but John Thomas, relieved of all responsibility and the necessity of earning his bread in the sweat of his face, was content that Benjamin should farm the land, pay the taxes and all expenses, receive the proceeds, and furnish his brother such sums of money as he demanded. The evidence is uncontradicted that John Thomas was well supplied with money, and that it was all furnished by his brother Benjamin. This condition existed before, as well as subsequently to, the execution of the deed by Elizabeth Fisher.

The court held that the deed executed by Mrs. Fisher was void and conveyed no title; a deed from Mrs. Bailey, one of Mrs. Fisher's daughters, to Benjamin Fisher was set aside, and the title to the land was quieted as follows: In Benjamin Fisher an undivided three-fourths, in the heirs of Perley J. Fisher, each a one-thirty-second part, collectively a one-eighth, and in Mrs. Bailey an undivided one-eighth. Benjamin's portion includes the share his sister, Mrs. Kolp, inherited, which she conveyed to him. The writer of this opinion is directed by a majority of the court to say that, while this court does not adopt all of the findings nor the reasoning of the learned district judge, we are of opinion that he attained the correct result, for the reasons following: We are inclined to the view that the heirs cannot now successfully question the validity of the deed from Mrs. Fisher to her son John Thomas. At this late date it is immaterial whether there was a consideration for the deed, or whether it was executed by reason of Benjamin's undue influence. John Thomas was in possession of this land, under a claim of right, for more than ten successive years subsequently to the execution of the deed and to Mrs. Fisher's demise, before he departed this life and before this suit was commenced. Therefore the plea of the statute of limitations is sustained. Nor do we think there is any such proof of recently acquired knowledge of the alleged duress, fraud or lack of consideration as will toll the statute.

To the contention made by the plaintiffs and by the relatives of the half-blood that the deed conveyed no estate to Benjamin, and that, since no writing was signed by Elizabeth Fisher or by John Thomas Fisher, no trust was created or declared which Benjamin may avail himself of, and therefore he has no interest in the land other than as an heir of John Thomas, we have to say: If the evidence of the justice of the peace is competent, it discloses that Elizabeth Fisher intended that her sons Benjamin and John Thomas should own the farm in equal shares, and but for the ignorance of all parties to the transaction, including the scrivener, a written instrument would have been prepared and signed to evidence that intent. However, the proof is satisfactory that, subsequently to the execution of the deed, Benjamin's possession was under a claim of right; he made lasting and valuable improvements on the farm and not only tilled the soil, but assumed authority to place his married children in possession of the land. Ordinarily such acts would reasonably be referable to a claim of right; but it is said that, because of the peculiar circumstances of this case, we should not so hold. But we find declarations of John Thomas, made at different times to within two years of his death, admitting by inference or directly his brother's interest in the land. In 1897, but two years after the deed was executed, John Thomas requested a third party to prepare a deed to convey all of the title to Benjamin, saying that "He ought to have it (the land)," and solely because the proposed scrivener desired to go home to luncheon, and the subsequent attraction of a ball game, that purpose was not consummated. John Thomas refused to sell part of the land because, as he said, it was always to remain in the Fisher family. This statement may indicate a testamentary intention, but it sheds some light on the controversy. Within two years of John Thomas' demise, in discussing the location of a ditch on the farm, he said in substance that he did not know whether Benjamin wanted the ditch constructed along

the proposed path, and that he and Benjamin owned the land together. There is some evidence of John Thomas' declarations to the contrary, and also Benjamin's declarations evincing a disclaimer of any interest in the land; but, taking all of the evidence together, we find that at all times subsequently to the execution of the deed to John Thomas, Benjamin Fisher asserted ownership to at least an undivided one-half of this land, and, in reliance upon his belief and contention that his mother intended that he should have an interest in the land, made lasting and valuable improvements thereon, and, with his brother John, held undisputed possession of the premises for more than ten years preceding the commencement of this action and subsequently to his mother's death, and during all of that time John acquiesced in that claim. A tenancy in common may be created by prescription. *Inglis v. Webb,* 117 Ala. 387. This estate in Benjamin was not created so much by a disseizin of his brother John, as by John's recognition of his mother's trust and confidence in him and his respect for his brother's rights. There was in effect an execution by him of the trust reposed in him by her, and, that trust having been fully executed and respected by him for more than ten successive years, not only should the ten year statute of limitations (code, secs. 5, 6) bar a recovery, but the case is within the principle announced in *Karr v. Washburn,* 56 Wis. 303, and *Oberlender v. Butcher,* 67 Neb. 410.

This brings us to the contention between the half-bloods and the descendants of Elizabeth Fisher; the one faction contending for an estate of inheritance because the deed from Elizabeth Fisher is one of purchase, and the other side asserting that the deed is one of gift, and, hence, by the terms of section 33, ch. 23, Comp. St. 1911, which provides that an estate of inheritance which vested in an intestate by devise or gift from some of his ancestors shall descend from him solely to such of his relatives as are of the blood of that ancestor, the line of descent is confined to the heirs of the full-blood.

We do not think that the execution of the mortgage and
the use of the funds acquired thereby should control the
character of Mrs. Fisher's deed. The money was secured
for the benefit of Benjamin Fisher and John Thomas
Fisher, and in effect they mortgaged their land to secure
the payment of their debt. Rather this controversy de-
pends upon the right of the heirs of the full blood to con-
tradict by oral evidence the recital in the deed from
Elizabeth Fisher that she was paid $2,000 therefor.

'A majority of the court instructed me to say that oral
evidence is admissible to prove the actual consideration
for a deed, even though the effect may be to convert the
instrument from one of bargain and sale into one of pure
gift; such proof has always been considered competent
in other actions, and a majority of the court does not
think sound sense should permit an exception to be made
in a case where, to do so, is to compel the court to hold
contrary to the fact, and thereby render ineffectual a
plain provision of the statute. Such evidence, although
admissible, should not be held to prove the fact, unless it
is clear and convincing and leaves no reasonable doubt in
the mind concerning the consideration given for the deed.

The courts of last resort are not in harmony in cases
like the one at bar. The following cases directly sustain
the majority of this court: *Bradley v. Love*, 60 Tex. 472;
*Rockhill v. Spraggs*, 9 Ind. 30; *Jones v. Jones*, 12 Ind.
389; *Kenney v. Phillipy*, 91 Ind. 511. See, also, *Sires v.
Sires*, 43 S. Car. 266, and *Salmon v. Wilson*, 41 Cal. 595.

The writer of this opinion, while recording the views of
a majority of the court, personally holds to the contrary.
That is to say, that while for many purposes recitations
in a deed may not, even as between the parties and their
privies, be conclusive evidence of the facts, and the reci-
tation of consideration is frequently held to be solely
*prima facie* evidence of the fact, yet it seems to me that,
both upon reason and the better authority, persons claim-
ing under a deed should not, in the absence of fraud, or
mutual mistake, be permitted to prove by oral evidence

that a recitation of a substantial, valuable consideration, where no other consideration is referred to in the deed, is false, and prove by the oral evidence that the sole consideration was good so as to change the quality of the estate thereby conveyed. In such cases the recitation gives quality to the estate transferred, and, to contradict it by oral evidence, violates the statute of frauds and perjuries. *Patterson v. Lamson,* 45 Ohio St. 77; *Brown v. Whaley,* 58 Ohio St. 654; *Groves v. Groves,* 65 Ohio St. 442.

Among the cases cited to sustain the majority of the court *Bradley v. Love, supra,* is directly in point, but the opinion is a mere declaration that the law is as stated and contains no convincing argument to sustain the conclusion. The later Indiana cases follow *Rockhill v. Spraggs,* 9 Ind. 30, and it was decided on the authority of *M'Crea v. Purmort,* 16 Wend. (N. Y.) 460. The New York case, however, merely involved the right of a party to a deed to prove that the consideration therefor was a quantity of iron delivered by the grantee to the grantor, rather than a money consideration, as recited in the deed. That case was correctly determined, but does not sustain the Indiana cases, nor the majority opinion in the instant case.

In *Salmon v. Wilson,* 41 Cal. 595, in addition to a recitation of a nominal valuable consideration, there was a recitation of a good consideration, and it was held that, upon a consideration of the entire instrument, the court should construe the deed to be one of gift.

In *Carty v. Connolly,* 91 Cal. 15, that court recognize the rule that, in the absence of fraud, oral evidence should not be received to contradict the recitation of consideration for the purpose of defeating the conveyance according to its terms. In the case at bar the testimony is convincing that the sole consideration for the deed was that of love and affection, and we conclude, upon a consideration of the entire record, that substantial justice has been done.

The judgment of the district court, therefore, is

AFFIRMED.

SEDGWICK, J., concurring.

The foregoing opinion was prepared by Judge ROOT while he was a member of the court, and is now adopted as a correct disposition of the case. The most serious contention in the case is determined by the second paragraph of the syllabus. The general rule is that the consideration expressed in a written instrument may be inquired into, and that it may be shown by parol testimony to be without consideration, although such consideration is recited in the instrument. The adjudicated cases are in conflict and each view is supported by many decisions. We think that the better reasoned decisions hold that the general rule obtains in cases of this kind. If there was a valuable consideration for the deed, the property goes, upon the death of the grantee, to his heirs in general. If the deed was in fact a gift from an ancestor of the grantee, the property upon the death of the grantee descends to those who are "of the blood of such ancestor." When the ancestor makes a gift to his descendant, and recites in the deed of gift that a valuable consideration was paid therefor, this recitation on his part may be for the purpose of controlling the line of descent of the property. We know, however, that in practice this recitation is often made in deeds for other and different purposes, or it may be carelessly made without any purpose whatever. If the conveyance is in fact a gift, and the ancestor desires to qualify the estate conveyed and control the line of descent, he can do so by inserting in the conveyance apt and conclusive words for that purpose. If the ancestor desires to make disposition of his property that shall take effect after his death, or to place limitations upon the title derived through him, he can accomplish these results through a gift of the property by will, and the law favors that method of making such posthumous limitations. It is not usual in practice to qualify the estate conveyed by so uncertain a method as recitations of consideration, and to adopt such methods would lead

to uncertainties in titles to real estate. We think, therefore, the better reason is in favor of the rule which we have adopted.